Inhabitants of Townsend *v.* Inhabitants of Pepperell.

INHABITANTS OF TOWNSEND *vs.* INHABITANTS OF PEPPERELL.

On trial of the issue of the insanity of a woman during a certain period, a witness being asked where the woman then lived, and replying that her home was with her father but she used to make visits elsewhere, his further reply that people used to have a great deal of sympathy with her is inadmissible, although offered as showing how she came to make such visits.

On trial of the issue of the insanity of a woman during a certain period, evidence of her general reputation in the neighborhood at that time as insane, and of declarations of her parents and others, since deceased, that she was then insane; and opinions of witnesses personally acquainted with her but not experts, as to her mental condition at that time; are inadmissible.

If an answer in a deposition is offered to be read at the trial only as a whole, and part of it is incompetent, the whole is inadmissible.

A record of the condition and treatment of a patient in a hospital, produced at a trial forty years after its date, by the superintendent of the hospital, as part of a series of records, of which he is the official custodian, purporting to be contemporaneously made by the attending physicians, of all cases there treated, and which it is their duty to make, is admissible in evidence, as a foundation for the opinion of an expert whether it indicates mental disease of the patient, without identifying the person who made it.

On a trial of the issue whether during a certain period a woman was so insane as to be unable to choose a settlement, a party prayed for an instruction to the jury "that the insanity which they were to find need not be complete madness, but such a disordered or unsound state of mind that by reason thereof she needed the care and oversight of a parent or guardian, or was an unfit person to be married, or, if she were a man, would not have been a fit person to be intrusted with state or municipal offices or places of trust." The judge having already instructed them that they were to consider whether, if her mind was diseased, it was so "to such an extent as to deprive her of her volition, free will and power of choice, so as to take away from her her self-control over her mind and herself in these particulars so that she he l no power to make choice of a settlement," refused to adopt the instructions prayed for, but did instruct them further "that the insanity need not amount to complete madness, and, if they should find that the degree of mental derangement was such as was indicated in the prayer, it would be very proper evidence for them to consider upon the question whether or not she had that kind and degree of mental derangement which the court had already instructed them that they must find that she had." *Held*, that the instructions given were correct; and included the substance of that prayed for, with proper modifications.

No exception lies, if, in response to a prayer for a ruling of law at a trial, the judge adopts and gives to the jury the substance of the ruling prayed for, but declines to adopt and give illustrations of the application of it which were included in the prayer.

CONTRACT for expenses incurred in supporting Mary Gilson, an insane pauper. The issue was, whether her settlement was with the defendants or with the plaintiffs.

At the trial in the superior court, before *Putnam*, J., it appeared that she was born in Pepperell on the 19th of November 1801, and, when she became of age in 1822, her father had a settlement there; but that he afterwards removed to Townsend, where he gained a settlement in 1842 and resided until his death, and where she lived with him until in 1856 she became hopelessly insane; and that in 1858 she was put under guardianship, and thereafter supported from proceeds of her property until 1864, when, it being exhausted, she was supported by the plaintiffs as a pauper, as also she had been from 1856 to 1858.

Among evidence offered by the defendants to show that she was insane before and when she became of age and ever afterwards, was the deposition of Samuel Farrar, who, to their nineteenth interrogatory, where Mary had her home before she and her father removed to Townsend, replied that she made her home with her father, and added: " She used to visit some; [the people used to have a good deal of sympathy with her,] and she used to stay at different places, perhaps a week or so at a time, sometimes at our house; people used to invite her." On objection by the plaintiffs, the words in brackets were excluded.

Five of the nine interrogatories and answers immediately following this were as follows:

" *Int.* 20. What was the occasion of people's having a great deal of sympathy with Mary, and inviting her to stay with them for a week or so, if you know? *Ans.* She was considered unfortunate and a person to be pitied; and from a desire to better her condition, if they could.

" *Int.* 21. What do you mean by saying that she was unfortunate, and that people had a desire to better her condition, if they could? *Ans.* She had been crossed in love, as had been understood, and was unfortunate, as a great many others have

been, and it affected her mind, folks thought, generally. I mean by unfortunate, that she could not marry the one she wanted to Her father would not let her marry George Wright; turned him out of the house a number of times.

" *Int.* 26. When you were on the board of selectmen ten years ago, when the subject of Mary's settlement was in dispute between Townsend and Pepperell, where did her father and mother then live; and what did they or either of them tell you, relative to Mary's insanity or mental derangement, while she lived in Pepperell, and before she became twenty-one years of age? State fully all the conversation. *Ans.* They lived in Townsend. The old gentleman regretted that he had interfered with Mary's wish to marry George Wright; he considered that the commencement of her trouble. Aberration of mind or craziness grew worse and worse till the trouble with Tyler. When she was at the paper-mill she would put her feet into cold water, and sit with them out of the window. The climax, when she came from Maine, was raving. This was in warm weather; am of opinion this was in 1822, but not certain.

" *Int.* 27. Do you know what was the common speech of people who were well acquainted with Mary and lived in her neighborhood, relative to her sanity or insanity before she became of age? If yea, what was it? *Ans.* I know what some people used to say. I inquired all round among the elderly people, such as Dr. Walton and Esq. Jewett. The doctor said he had been their family physician, and knew them intimately; knew the case of Mary, and did not consider her competent, at the time she became of age, to gain a residence in any other town, or in her own right; considered her crazy.

" *Int.* 28. What did the people in the neighborhood of Mary, and those who were acquainted with her generally, say of her sanity or insanity before she became of age? *Ans.* Said she was insane. I never heard but one person say she wasn't."

All of these, on the plaintiffs' objection, were excluded. In regard to the twenty-seventh answer, it appeared that Dr. Wal ton and Esq. Jewett were both dead before the taking of Far rar's deposition.

The defendants further offered the deposition of Eleanor E. Shattuck, containing, among others, the following interrogatories and answers:

"*Int.* 10. Do you know of Mary's being insane or crazy before 1822? *Ans.* Yes; because I was married in 1819, and she was crazy before that.

"*Int.* 14. How was she different from the other girls about her age, between 1815 and 1822? State what you know. *Ans.* Because she was lovesick, and crazed too. I says, ' Mary, they say you are crazy lovesick.' She says, ' I am not lovesick, but I shall be crazier if Tyler goes down east.' She did grow worse, and ran away. Tyler did go down east, and she stole away after him. She was very crazy afterwards. She would stamp round and tear.

"*Int.* 25. Do you know whether or not Mary was capable of taking care of herself at all times from 1818 to 1822? *Ans.* I shouldn't suppose she was. It appears to me that when she became seventeen or over she became more crazy; seems to me so."

On the plaintiffs' objection, these also were excluded.

One of the defendants' witnesses having testified that Mary was a patient in the Massachusetts General Hospital in 1825, the plaintiffs, to show that she was not there as insane, called Benjamin F. Shaw as a witness, who testified that he was and for fifteen years had been superintending physician of that hospital, and that it was not an insane hospital; and who produced a written book and said that it was a record of the medical history of the cases at the hospital for a period embracing 1825; that he did not know who made any of the entries, nor when they were made, but found the book among the regular records of the hospital; that in regular course of business of the hospital records were kept of all cases, and this book was one of a series; that he was the regular custodian of these books, and it was the duty of the physicians in charge of patients to enter in them the history of the cases as they came under their charge at the hospital, and he had no doubt that the records in this case were made in the usual way. The book contained the name of Mary Gilson,

as having entered the hospital July 25, 1825, and been discharged relieved September 10, 1825, and what purported to be an account of her sickness previous to entering, as given by her, and a daily account of her condition at the hospital, (apparently taken in part from her own statements,) and an account of the medicines there administered to her. The plaintiffs proposed to ask the witness if there was anything relating to Mary, either in the account of her condition or of her treatment, which indicated mental disease or insanity. The defendants objected to the witness' stating conclusions which he had made from reading the book; and the plaintiffs then offered the book itself in evidence, and, against the defendants' objection, it was admitted, and the questions were permitted to be put; and the witness answered in the negative.

The judge, in charging the jury, among other instructions not objected to, instructed them "that, upon the circumstances of this case, it would not be sufficient merely to show mental derangement in Mary Gilson at the time she became of age; and that it was not every degree of mental derangement which would prevent her from gaining a settlement, or which would make her so insane as that her settlement would follow that of her father; that they were, in the first place, to consider all the evidence in reference to her peculiarities of conduct and mind, and say whether they were the result of ill-health or indicated mental disease; and, if the latter, whether to such an extent as to deprive her of her volition, free will, and power of choice, so as to take away from her her self-control over her mind and herself in these particulars, so that she had no power to make choice of a settlement; that, if it did, it incapacitated her from gaining a settlement, and she might then be considered so insane as that her settlement followed that of her father."

The defendants then prayed for an instruction, "that the insanity which they were to find need not be complete madness, but such a disordered or unsound state of mind that, by reason thereof, she needed the care and oversight of a parent or guardian, or was an unfit person to be married, or that, if she were a man, she would not be a fit person to be intrusted with state or

municipal offices, or places of trust." The judge refused this prayer, but did instruct the jury that the insanity need not amount to complete madness; that if they should find that the degree of mental derangement was such as was indicated in the prayer, [reading it to them,] it would be very proper evidence for them to consider upon the question whether she had or not that kind and degree of mental derangement which the court had already instructed them that they must find that she had."

The jury returned a verdict for the plaintiffs; and to the exclusion of the evidence as above recited, and to the instructions of the court, so far as they were in conflict with the instruction asked for, the defendants alleged exceptions.

*D. S. Richardson & L. Wallace*, for the defendants. 1. The exclusion from Ans. 19 in Farrar's deposition of the statement that the people used to have a good deal of sympathy with Mary was wrong. It was explanatory of the rest of the answer; and was a foundation for Int. 20, 21, which were admissible for the same reason.

2. Evidence of family and general reputation, such as in Int. and Ans. 26–28 in Farrar's deposition, was competent. 1 Phil. Ev. (4th Am. ed.) 248, Pedigree. *The King* v. *Eriswell*, 3 T. R. 707. *Haddock* v. *Boston & Maine Railroad*, 3 Allen, 298.

3. The excluded portions of Shattuck's deposition were admissible in part.

4. The hospital record was not one required by law. As to the facts recorded, the defendants had no opportunity of cross-examination. They therefore were not a sufficient foundation for the opinion of an expert. Her case may have been treated as there recorded, but such treatment was only the result of the opinion of the then attending physician, and not a sufficient foundation for the opinion of Dr. Shaw as to what that treatment did or did not indicate in the case of that precise patient.

5. The rule laid down by the judge, that the defendants must show that Mary's mental derangement was such as to deprive her of her volition, free will and power of choice so far as to render her incapable of making choice of a settlement, was incorrect; for a certain degree of weakness of mental power, not

idiocy or loss of will, but lack of proper understanding to guide the will, was all that was requisite. Chit. Med. Jur. 346. Ray Med. Jur. c. 3, Imbecility. The instructions which the defendants asked were proper measures of the requisite degree of mental derangement, and should have been given as such. *Upton* v. *Northbridge*, 15 Mass. 237. *Buckland* v. *Charlemont*, 3 Pick. 173. *Hopkinton* v. *Upton*, 3 Met. 167. *Breed* v. *Pratt*, 18 Pick. 115. Under the rulings in the present case the verdicts in *Upton* v. *Northbridge* and *Buckland* v. *Charlemont* would have been impossible. In those cases the rulings defined want of understanding, not loss of will, as the test. The true rule here, as in those cases, was, not whether Mary had lost all power of volition or self-control, but whether her mind was so far deranged as not to be guided by sufficient intelligence to enable her to enter upon and discharge the duties of life, as an emancipated person capable of trusting in, relying on, and taking care of herself.

*T. H. Sweetser & F. A. Worcester*, for the plaintiffs.

CHAPMAN, J. The subject of the controversy in this case was the insanity of Mary Gilson in 1822, when she became of age. The testimony of Mr. Farrar in his deposition, that the people used to have a good deal of sympathy with her, was properly ruled out, because it was not pertinent to the issue. The opinions and hearsay statements in his other answers were also excluded properly. The same remark applies to Mrs. Shattuck's answers, except a part of the fourteenth. But this answer was offered as a whole, and the part that is competent was not offered to be read separately from the rest.

The records of the hospital were properly admitted in evidence. *Kennedy* v. *Doyle*, 10 Allen, 161.

The question presented to the jury by the instructions of the court was, in substance, whether Mary Gilson, by reason of insanity, so far lost her self-control that she had no power to make choice of a settlement. The request for instructions contained illustrations which the court properly declined to adopt. Its substance was adopted, with proper modifications.

*Exceptions overruled.*