# SNELL *v.* THE UNITED STATES.

CRIMINAL LAW; HOMICIDE; JURY, QUALIFICATION OF; EVIDENCE; INSANITY; BOOK ENTRIES; EXPERT TESTIMONY; HYPOTHETICAL QUESTIONS; INSTRUCTIONS TO JURY.

1. In an examination upon the *voir dire* of a talesman in a prosecution for murder, the inquiry into the state of his mind ought not to be carried beyond the limit of ascertaining that he is unbiased for or against capital punishment, and that he is without prejudice against imprisonment for life as a punishment for murder; and where the talesman declares that he is without such bias or prejudice, and that his finding a qualified or an unqualified verdict in event of the conviction of the accused of murder, would depend upon the facts and circumstances of the case, an objection by the accused to the competency of the talesman to serve as a juror is properly overruled; *following* Funk v. United States, *ante*, p. 478.

2. In a prosecution for murder, where the defense is insanity, evidence of general reputation in the family as to the mental condition of a second cousin of the accused—or even of the accused himself—is inadmissible.

3. That which is not evidence in its nature and quality as proof, can not be made evidence by being authenticated under Sec. 906, R. S. U. S., the object of which is to authenticate evidence that exists according to established principles of law.

4. *Quære*, whether the books of the Georgia State Sanitarium, are books of a public office of the State within the meaning of Sec. 906, R. S. U. S.

5. Copies of entries in the books of a State insane asylum, authenticated under Sec. 906, R. S. U. S., offered in evidence in a murder trial by the accused whose defense is insanity, to show the insanity, treatment and incarceration of certain of his relatives, are inadmissible to prove the particular facts stated, unless it be so expressly provided by statute or be shown that the entries were made in the regular course of official duty.

6. Questions will be allowed to be propounded experts upon cross-examination which are based upon hypotheses broader or more or less extensive than the facts in proof, in order to test the knowledge, information and competency of the witnesses as experts.

7. It is not error for the trial court to refuse instructions asked by the accused in a homicide case, in which the defense is insanity, to the effect that if the jury believe the accused was insane

at the time of the killing, and such insanity was induced by strong drink operating upon a mind rendered unsound by an injury to the brain or by disease, they should find him not guilty by reason of insanity; and that if the accused at the time of the killing, although not insane, was in such a condition of mind by reason of drunkenness as to be incapable of forming a specific intent to kill, the grade of his crime would be reduced to manslaughter; where the evidence does not support such instructions, and where the jury are informed by other instructions that before they can find the accused guilty they must find he had sufficient mental capacity to distinguish between right and wrong at the time of and with respect to the act which was the subject of inquiry, beyond a reasonable doubt.

8. In such a case, an instruction asked by the prosecution is properly granted, which is to the effect that if the jury find the defendant was insane up to the time of committing the crime, and sane immediately afterwards, they should find him sane at the moment when the crime was committed; *following* Taylor v. United States, 7 App. D.C. 27, and Horton v. United States, 15 Id. 310.

No. 987. Submitted May 3, 1900. Decided June 5, 1900.

HEARING on appeal by defendant from a judgment of conviction and sentence of the Supreme Court of the District of Columbia, holding a special term for criminal business, in a prosecution for murder. *Affirmed.*

The facts are sufficiently stated in the opinion.

*Mr. Charles H. Turner* and *Mr. F. Edward Mitchell* for the appellant:

1. Under our statute the juror should stand indifferent between the two penalties. *Melvin* v. *State*, 11 La. Ann. 535; *Stall* v. *State*, 28 Ala. 25; Proffat on Jury Trials, 178; *People* v. *Reyes*, 5 Cal. 347. If the juror's state of mind is such as to demand palliating or mitigating circumstances, before agreeing to a qualified verdict, he has set up for himself a test which the Supreme Court expressly said was a false test. *Winston* v. *United States*, 172 U. S. 303.

2. It is admissible to prove the insanity of a person by reputation in his family when that is the best evidence obtainable. Rogers on Expert Testimony, p. 168; *State*

v. *Windsor*, 5 Harr. (Del.), 512; *Townsend* v. *Pepperel*, 99 Mass. 40.

3. The record from the Georgia State Sanitarium, as exemplified, was plainly admissible under section 906, R. S. U. S. The superintendent is a public officer of the State of Georgia, and the record kept in his office was admissible in any court in Georgia as evidence. Sec. 5211, Georgia Code, 1895; *Shivers* v. *State*, 53 Ga. 152; *Robertson* v. *Pickrell*, 109 U. S. 608.

4. The cross-examination of defendant's experts, in which the Government's attorney added to the question of defendant a hypothesis not supported by the evidence, was, without doubt, prejudicial to the defendant and without warrant in law. *Acc. Assn.* v. *Kemper*, 24 U. S. App. 364; *State* v. *Stokely*, 16 Minn. 282; *Conway* v. *State*, 118 Ind. 482; *People* v. *Lake*, 12 N. Y. 358. As holding that questions raising a collateral issue are inadmissible even to test expert's competency, see, *Buck* v. *Boston*, 165 Mass. 509; *State* v. *Griswold*, 67 Conn. 290; *Ulrich* v. *People*, 39 Mich. 245; *Adams* v. *Brown*, 16 Ohio St. 75.

5. The true test of responsibility of a defendant for criminal acts is his sanity or insanity at the time of the commission of the acts, and not his condition just before and immediately afterward. 3 Witthaus and Becker's Med. Jur. 424; Wharton and Stille's Med. Jur. (1882), Sec. 117. See, also, *Flanagan* v. *People*, 52 N. Y. 469; *People* v. *Cummings*, 47 Mich. 335; *Roberts* v. *People*, 19 Mich. 401; *Terrell* v. *State*, 74 Wis. 278.

*Mr. Thomas H. Anderson*, United States Attorney for the District of Columbia, and *Mr. Ashley M. Gould*, Assistant Attorney, for the United States.

1. The right of challenge is a right to reject and not a right to select, and a party can not generally complain that the court has excused jurors without cause or sustained untenable challenges of the other party. *Horton* v. *United*

*States,* 15 App. D. C. 310; *United States* v. *Merchant,* 12 Wheat. 480; *Hayes* v. *Missouri,* 120 U. S. 68; *Spies* v. *United States,* 123 U. S. 131; *Garlitz* v. *State,* 71 Md. 301; 1 Thompson on Trials, Secs. 43 and 120.

2. Insanity is a fact that can not be proved by reputation. *State* v. *Hoyt,* 47 Conn. 539; *State* v. *Coley,* 114 N. C. 884; *Foster* v. *Brooks,* 6 Ga. 287; *Choice* v. *State,* 31 Ga. 424; *People* v. *Pico,* 62 Cal. 53; *Ashcraft* v. *De Armond,* 44 Iowa, 233; *Walker* v. *State,* 102 Ind. 507.

3. The refusal of the trial justice to admit in evidence an exemplification of the record of the Georgia State Sanitarium, showing the mental condition, treatment, and incarceration of certain relatives of the defendant, was proper. That institution is not a " public office of any State or Territory," within the meaning of section 906 R. S. U. S. Moreover, the excerpts offered simply state the conclusions of some person or other employed therein, such conclusions being necessarily based upon the statements of other parties not in any way connected with the institution. Even when reports made by public officers having authority in the premises embody conclusions only they are not admissible in evidence. *Coyner* v. *Boyd,* 55 Ind. 166; *Erickson* v. *Smith,* 38 How. Pr. 455. Public records are admissible to prove only that which they are authorized by law to contain and that which is necessary to accomplish the purposes or objects for which they are kept. *Shumway* v. *Leaky,* 67 Cal. 458; *Com.* v. *Heffron,* 102 Mass. 148; *Sewall* v. *Sewall,* 122 Mass. 156.

4. The extent to which the cross-examination of an expert witness may be carried is a matter resting in the sound discretion of the trial justice, and no definite limits thereto can be prescribed as a rule of law. ·*Horton* v. *United States, supra;* *Forsyth* v. *Doolittle,* 120 U. S. 73; *State* v. *Porter,* 34 Iowa, 131; *Ingledew* v. *Railway Co.,* 7 Gray, 86; *Howes* v. *Colburn,* 165 Mass. 385; *Andre* v. *Hardin,* 32 Mich. 324; *Dilleber* v. *Life Ins. Co.,* 87 N. Y. 79; *People* v. *Augsbury,* 97 N. Y. 501.

Mr. Chief Justice ALVEY delivered the opinion of the Court:

This appeal comes into this court from the Supreme Court of the District of Columbia. The appellant, Benjamin H. Snell, was tried in that court on an indictment charging him with the murder of Elizabeth M. Weisenberger on the 6th day of August, 1899, by cutting her throat with a razor. The accused pleaded not guilty, and was tried and convicted, the verdict of the jury being guilty as indicted, without qualification.

In the course of the trial many exceptions were taken to rulings of the court on behalf of the accused, and the first questions that arose to the rulings upon which exceptions were taken relate to the qualification of jurors. The regular panel of jurors having been exhausted, talesmen were summoned in and were examined on the *voir dire,* and after being interrogated as to other matters and found competent they were then subjected to a most searching scrutiny as to the circumstances and condition of case in which, if the accused should be found guilty of murder, they would be in favor of rendering an unqualified or a qualified verdict, as authorized by the act of Congress of January 15, 1897, Ch. 29. The act of Congress referred to provides that " in all cases where the accused is found guilty of the crime of murder or of rape, under sections 5339 or 5345, Revised Statutes, the jury may qualify their verdict by adding thereto 'without capital punishment,' and whenever the jury shall return a verdict qualified as aforesaid the person convicted shall be sentenced to imprisonment at hard labor for life." 29 Stat. 487. The question as to the character of the verdict that the juror might be inclined to render under this provision of the statute was a subject of the most protracted inquiry and contention before the court.

The bill of exceptions contains but a very meagre statement of the facts, and it fails to state that the talesmen who were ruled to be qualified and competent, were in fact

sworn as members of the panel of jurors to try the case.
We may, however, assume that they were so sworn, or
otherwise the exceptions noted would not have been veri-
fied by the signature of the justice to the bill of exception.

1. The substance and effect of the errors assigned in
respect to this part of the case, are, that, by the ruling of
the court, the accused was refused the right to make suffi-
cient inquiry to ascertain the exact condition of the mind
of the talesman with respect to the qualified verdict author-
ized by the statute,—whether, if the accused were found
guilty of murder, the verdict should be guilty generally, or
guilty without capital punishment. The questions and
repetition of questions that were propounded to the tales-
men would appear to have been confusing and perplexing
in the extreme to the minds of the proposed jurors, as they
had to be repeatedly explained and changed in terms,
before definite answers could be obtained. But, ultimately,
and after much argument and contention, answers suffi-
ciently definite were obtained to show the condition of mind
of the proposed jurors to be free of bias for or against capi-
tal punishment, and entirely unprejudiced against the pun-
ishment by imprisonment for life, as punishment for the
crime of murder. This left the mind of the juror entirely
free; and that is all that can be required of intelligent men,
when called upon to act as jurors. The hypothetical or
supposable cases embodied in the questions propounded
were greatly calculated to mislead the mind of the proposed
juror, as the cases supposed in the questions, or some of
them, might never be shown in proof. By such course of
examination, the attempt was to draw out, by anticipation,
what might be the inclination of the feelings and judgment
of the proposed juror, upon a state of case that might never
be established in proof, and thus, upon such indication of
mind of the proposed juror, to get rid of him by challenge,
though an entirely competent juror in the particular case.
The preliminary inquiry into the state of the juror's mind

ought not to be carried to such an extent, and ought not to be carried beyond the limits of ascertaining that the proposed juror is unbiased for or against capital punishment, and that he is without prejudice against imprisonment for life as a punishment for murder. To extend this preliminary inquiry further, as affecting the qualification of the juror, would be to open the door to an examination that would tend largely to defeat the ends of justice.

The examination of the proposed jurors on the *voir dire* in this case exemplifies the extreme degree of scrutiny into the minds of the proposed jurors upon this subject, insisted upon on behalf of the accused.

John Glick, a talesman, was sworn and examined by the court. He was asked the following question :

"Have you any bias, one way or the other,—or could you come to the question of punishment with an equal mind and then determine whether he should be hanged or imprisoned for life ? " Answer : "Yes, sir." Question : "Can you do that without bias or prejudice one way or the other ? " Answer : "Yes, sir."

Then, by counsel for the accused. Question : "You think that imprisonment in the penitentiary is sufficient punishment for the crime of murder ? " Answer : "In some cases." Question : "So that it would take evidence on behalf of the defendant in any case to allow you to approach the consideration of whether or not you would inflict the death penalty or imprisonment for life, with an unbiased mind ? "

The question being objected to, and after considerable discussion and explanation, the court said : "The juror has distinctly said, in response to the court, that when he found a man was guilty he could approach the question of the punishment, as to whether it should be the death penalty or imprisonment for life, with an unbiased mind, and decide each case according to his best judgment. Is that what I understand you to mean ? " By the talesman : "Yes, sir."

But the counsel for the accused not being satisfied, insisted

upon further interrogation, and after argument the court said to counsel, "Ask the talesman whether he can decide indifferently between the question of capital punishment or life imprisonment." But the counsel's reply was, that he would like to insist upon a question that he had already propounded; and, upon that being refused, the accused excepted.

The counsel for the accused then proposed to ask this question: "If you serve on the jury and should find the defendant guilty of the crime of murder beyond a reasonable doubt, with all the elements of murder, would you, in all cases, insist upon or strongly favor the death penalty, unless there were palliating or mitigating circumstances in the elements that make up the case?" This question was objected to by the attorney for the Government, but the objection was overruled and the question allowed, and the court asked the talesman whether he understood the question, and the response was that he did. But the court asked what he meant by the reply, and the answer was: "I think a person who is guilty of murder ought to be punished for it." The talesman was then asked whether that was what he understood to be the question of the defendant's counsel, and the reply was, "Yes, sir."

Then followed this question: "Now, the law says that the jury shall say how the accused shall be punished— whether he shall be punished by hanging or by imprisonment for life. After you have found that he is guilty, have you any prejudice or bias in favor of the hanging of the person convicted, or in favor of imprisonment for life?" Answer: "It would depend largely on the evidence." Whereupon the court pronounced the talesman competent as a juror.

But counsel for the accused, not content, still persisted in putting further questions, and upon the question proposed being read, the talesman said he did not understand it; and upon the question being changed, it was propounded in this form: "If you find the defendant guilty of

murder beyond a reasonable doubt, with all the elements of murder in the case, it would then become your duty, we all agree so far, to consider whether such a man should be hanged or sent to the penitentiary for life. Now, when we come to approach that second question, would you require some palliating or mitigating circumstances that had been brought out before or whose existence you suspected in the case (I do not go beyond the Supreme Court there) before you would consent to give him the lesser penalty?" This question was objected to by the attorney for the Government, and the objection was sustained. Whereupon the defendant by his counsel took an exception.

In respect to the scrutiny to which talesmen Lynn and Muth were subjected, substantially the same course of examination was pursued as in the case of Glick. Both these talesmen, Lynn and Muth, declared on the *voir dire*, that they were without bias or prejudice in regard to the character of the punishment to be inflicted, in the event that the accused should be found guilty of murder—that is, whether by hanging or by imprisonment for life; and that their finding a qualified verdict or an unqualified verdict, upon finding the accused guilty of murder, would depend upon the facts and circumstances of the case. And because the talesmen declared that the finding of a qualified or an unqualified verdict would depend upon the facts and circumstances of the case, they were objected to as being incompetent to serve as jurors; and upon the objection being overruled, the accused excepted.

We do not know how the talesmen could, as intelligent men, have answered the inquiries made of them, as to the unbiased and unprejudiced condition of their minds, otherwise than as they did. Their minds were shown to be fair and impartial, as to the form and character of the verdict that might be found, and that was all that could be required of them, on a mere hypothetical state of a case that might never be shown in proof. This question has been

fully considered and determined in the preceding case of *Funk* v. *United States*, *ante*, p. 479, and that case is quite conclusive of the questions here presented. See, also, case of *Horton* v. *United States*, 15 App. D. C. 310.

A jury having been impaneled, the testimony on the part of the prosecution, as set forth in the bill of exception, tended to show that between the hours of six and seven o'clock on the morning of August 6, 1899, the accused went to the house of Karl Weisenberger, with whom he was acquainted, greeted him in his usual manner, and asked for a drink of water; that Weisenberger (there being no water in the house) left the house to go to a hydrant about ten feet distant, and the accused passed through the house and entered the kitchen, where Mary Weisenberger, the wife of Karl and mother of the deceased, was preparing breakfast; that the accused greeted her in his usual manner, and she responded by ordering him out of the house, and accused him of having ruined her daughter Elizabeth; that the accused passed out of the kitchen into the adjoining room, where the daughter, Elizabeth Weisenberger, was sleeping, drew a razor from his pocket and cut her throat, inflicting five wounds, and nearly severing her head from her body; that when the mother, hearing the cries of her child, rushed into the room to protect her, the accused assaulted the mother, cutting her twice; that thereupon the accused passed out of the bedroom through the front room and out of the front door, where he met the father, who, seeing the blood upon his hands, kicked him down the steps and followed him up the street; that the accused ran for a short distance and then came to a walk; that the father followed him and charged him with having killed his daughter; that thereupon the accused turned and said, "Yes; I cut her throat and I will cut yours, too;" that thereupon the accused left the traveled road and was pursued across the fields and through the woods; that when his pursuers drew near him he frequently turned and menaced them; that when he

was captured by a police officer he claimed he had done nothing, and upon the officer's demanding his gun he replied that he had no gun, but had a razor, which he surrendered.

Evidence was also introduced on the part of the prosecution tending to prove that the deceased was thirteen years of age and had lived in the family of the accused for about five years prior to her death as a companion for his daughter, who was about the same age, and that she had only been away from the house of the accused three times in that period—the last time being about two months before she was killed ; that after she left the house of the accused on said last occasion he had made strenuous efforts to secure her return, and had offered to share his life insurance with her, and had threatened that unless she returned to his house he would kill her.

Upon the Government resting its case, several witnesses were introduced and examined on the part of the accused, by whom testimony was given tending to show insanity of the accused.     One of these witnesses was Benjamin W. Snell, the father of the defendant, by whom testimony was given tending to show that various members of defendant's family were insane, and the following question was asked concerning one Jesse Simpson, a second cousin of the accused : "What was the reputation in the family as to the mental condition of Jesse Simpson?"     To which question objection was made and sustained, and the counsel for the defendant caused an exception to be noted.

2. The objection to this question was properly sustained. The evidence of general reputation in the family as to the *mental condition* of a second cousin of the accused was clearly inadmissible.     In the first place, the relationship of the party to the accused was entirely too remote and indefinite to furnish any reasonable ground for a conclusion as to the insane condition of the accused.     But *general reputation*, whether in the family or in the neighborhood, as to the

mental condition of a party is not admissible as evidence
even with respect to the condition of the mind of the accused
himself, as showing such condition of mind in fact as will
render him irresponsible for criminal acts. In respect to a
criminal act, insanity is a fact that can not be proved by
mere general reputation as to the condition of mind of the
party. The facts of the case, in connection with the alleged
diseased or unsound condition of mind of the accused, must
be considered in determining the question, whether there
was criminal responsibility in perpetrating the particular
act charged. A party may be erratic, or at times, in some
respects, even insane, and yet be responsible for a particular
criminal act. The authorities are conclusive upon the ques-
tion of the non-admissibility in evidence of mere general
reputation.

In the case of *State* v. *Hoyt,* 47 Conn. 518, 539, there was
evidence offered by the accused that his father was reputed in
the neighborhood where he lived to be at times insane, but
the Supreme Court of the State held that such evidence was
properly rejected. The court said: " Insanity is a fact that
can not be proved by reputation. It seems to us impossible
to suggest a more objectionable instance of hearsay evidence
than this, being, in effect the mere opinions out of court as
to another's insanity, not only without the sanction of an
oath and the test of cross-examination, but without even the
facts on which the opinions were based, which would be
indispensable in the case of a non-expert, who should give
his opinion under oath in court."

In the case of *People* v. *Pico,* 62 Cal. 53, a witness was
asked if the defendant was always treated by his family as
an imbecile or an insane person. An objection was made
to the question and sustained; and the Supreme Court of
the State held this ruling to be correct, and said : " How he
was treated by his family would not tend to prove insanity;
they may have been mistaken as to the condition of the sub-
ject and as to their mode of treatment; besides, the answer

would be but the opinion of one person based on the opinions of others."

In the case of *State* v. *Coley*, 114 N. Car. 884, there was an attempt made to prove insanity by general reputation, and the Supreme Court, in disposing of the question, said : "But while testimony as to mental capacity falls within the exception to the rule governing the admissibility of proof of opinions, we know of no principle upon which hearsay evidence of what experts or non-experts have thought or said of the insanity or sanity of a particular person can be made competent. The attempt to prove insanity by general reputation was not less objectionable and incompetent than would have been the attempt to show by a third party what a particular individual thought or said."

And so in the case of *Walker* v. *State*, 102 Ind. 507, where the same principle was asserted. In that case the accused proposed to prove by his father that it was commonly reputed in the family that his, the witness', grandfather and one of his uncles were insane, but the court held that such proof was inadmissible, and this ruling was sustained on appeal. The court said : "Evidence of the kind proposed was held to be admissible in the case of *State* v. *Windsor*, 5 Harrington, 512, and that case is quoted from and cited approvingly by Rogers on Expert Testimony, at section 60, but we regard the decided weight of authority as against its admissibility."

Without quoting from other decisions, we may simply refer to the cases of *Choice* v. *State*, 31 Ga. 424, and *Ashcraft* v. *De Armond*, 44 Iowa, 233, as fully sustaining the principle of the cases quoted by us.

We therefore think that the court below was entirely right in rejecting the proposed evidence of family reputation as to the condition of mind of Jesse Simpson.

3. After evidence had been introduced tending to show the insanity of the accused, certain extracts from, or copies of entries made in the books of the Georgia State Sanitarium were offered in evidence in behalf of the accused

for the purpose of showing the mental condition, treatment, and incarceration of relatives of the accused, identified as such relatives, though without designating the degree of relationship, by the witness, Benjamin W. Snell; but upon objection to the admissibility of such extracts or copies of entries, they were excluded, and the defendant excepted.

We suppose these extracts or copies of entries were offered upon the supposition that they were made legal and competent evidence by section 906 of the Revised Statutes of the United States. But we suppose the object and purpose of the section referred to was to authenticate that which was competent evidence, and not to make that evidence which was not in its nature and quality of proof, evidence, by the mere force of the statute of the United States. That was clearly not within the meaning and intent of the provision of the Constitution. Art. 4, Sec. 1. The object of that provision was not to make evidence, but to authenticate evidence that existed according to established principles of law. The question then is, upon the offer made, whether the copies or extracts from the books of the sanitarium were admissible, with the authentication attached?

The copies from the books of the sanitarium appear to have relation to four different persons. There is, however, no evidence to show in what degree of relationship they stood to the accused; whether in the second, third, fourth or fifth degree. It is not shown how and in what degree the relationship existed, though there may have existed relationship.

The first of these entries professes to be taken from book 4, at page 26, and to relate to a Mrs. Elizabeth Jackson. The entries are: "Lunatic of and from Columbus, Georgia. Age about 68 years. Widow. Has been insane thirty-five years. Cause unknown, but supposed death of her husband. Is always quiet. Not destructive or disposed to acts of violence, but is liable to do mischief with fire. Is an inveterate smoker. Her general health is good. Eats

regularly and generally sleeps well. Received 16th Nov., 1873. Died March 2d, 1881."

"Book 4, page 576. Mr. John M. Simpson. Lunatic from Washington County, Ga. Native of Bibb County, Ga. Age 42 years. During the late war became insane while in service. Returned home; was supposed restored, but always appeared of weak mind since, but did pretty well on farm. He has lost two wives since the war; last child died recently, leaving a child now four months old; cause of insanity unknown. Imagines he is still engaged in the war; that some one is seeking to kill him. Constantly wandering about the country. Has not been healthy. Has had intermittent fever most of this year. Was never disposed to drink until he became insane. His grandfather died insane, his mother once in such condition, and he had a sister who was restored in this institution and remained well until she died last summer. He eats satisfactorily, but does not sleep well. General health feeble. Received 9th Dec., 1878; died March 7th, 1885."

"Book 9, page 206. Mrs. Tenella I. Smith, from Washington County, Ga. Age 26 years. Married. Has borne three children. Youngest five years old. Occupation, household duties. Duration of mental trouble, five months. Her mind seems to have given away suddenly. Cause, supposed from ill-health and distress. There has been no insanity known to exist in her family, excepting her grandfather, just after the war, &c., &c. General health, feeble. Has been under treatment. Received 10th August, 1888. Discharged Nov. 3, 1888, restored."

"Book 11, page 362. Mrs. Amanda I. Kendrick. Lunatic of Washington County, Ga. Age, 47 years. Married. Wife of a farmer. Duration of insanity, three weeks. Predisposing cause, hereditary. Exciting cause, supposed religious excitement. At times violent and destructive, &c., &c. Has been under treatment. Received 23d Dec., 1893. Discharged 28th Sept., 1896, restored."

These copies of entries, taken from the books of the sanitarium, are certified to be true copies of the entries in the books of the institution, so far as the same relate to the patients named, by T. O. Powell, superintendent and resident physician, to which is appended the certificate of the county judge to the effect that Powell is superintendent and resident physician, and that his certificate is in due form, and by the officer in charge of the institution. .

Whether the books of this institution are books of a public office of the State within the meaning and purview of the act of Congress, March 27, 1804, Ch. 56, now embodied in section 906, Revised Statutes of the United States, would seem to admit of a serious question. But waiving that question and saying nothing of the fact that it is not shown what was the degree of relationship that existed between the parties mentioned in these entries and the accused, it is very manifest that from the nature and character of the entries themselves they were based upon report and mere hearsay, at least, as to all such portion of the entries that related to the parties before they were received into the institution. When and by whom the entries were made does not appear, nor does it appear that they were made by and according to any legal requirement. The trustees of the institution are required to make report of the doings and condition of the institution to the legislature; but our attention has not been called to any provision of the statute of the State that requires a registry of the institution to be kept, such as that indicated by the entries offered in evidence, and designating the person by whom such registry should be made and kept.

While the registry or entries may be admissible in evidence for some purposes, it is very clear that they are not admissible in proof of *the particular facts stated* unless it be so expressly provided by statute or be shown that the registry or entries are made in regular course of official duty. For it is a settled principle, says Professor Greenleaf

(1 Greenl. Ev., Sec. 493), "that *official registers* are not in general evidence of any facts not required to be recorded therein and which did not occur in the presence of the registering officer. Thus a parish register is evidence only of the time of the marriage and of its celebration *de facto*, for these are the only facts necessarily within the knowledge of the party making the entry. So a registry of baptism taken by itself is evidence only of that fact, though if the child were proved *aliunde* to have been very young it might afford presumptive evidence that it was born in the same parish. Neither is the mention of the child's age in the register of christening proof of the day of its birth to support a plea of infancy. In all these and similar cases the register is no proof of the identity of the parties there named with the parties in controversy, but the fact of identity must be established by other evidence. It is also necessary in all these cases that the register be one which the law requires should be kept, and that it be kept in the manner required by law." Many cases are cited in support of this text by the author, and in addition to those there cited, see the case of *Prigg* v. *Lansburgh*, 5 App. D. C. 30, 36.

The case of *The Inhabitants of Townsend* v. *The Inhabitants of Pepperell*, 99 Mass. 40, is much relied on by the counsel for the accused; but that case gives but slight support to the contention made by them. Indeed, it has little or no similarity to this case. That was an action on contract by one township against another, for expenses incurred in supporting an insane pauper, and the question was whether the settlement was with the defendants or with the plaintiffs. And there the record of the hospital where the party was treated, forty years prior to the trial, and made by the attending physician, *whose duty it was to make faithful contemporaneous entries of the condition and treatment of all patients treated by him*, was received in evidence on the issue of insanity of the pauper. It is not stated in the report of the case upon what principle such record was received.

But in the same case it was held, that on the trial of an issue of insanity of a woman, during a certain period, evidence of her general reputation in the neighborhood, at that time, as insane, and of declarations of her parents and others, since deceased, that she was then insane, and opinions of witnesses personally acquainted with her, but not experts, as to her mental condition at that time, were *inadmissible.*

We are clearly of opinion that the copies of entries taken from the books of the sanitarium were properly rejected by the court, as being inadmissible for the purpose for which they were offered.

4. The next question that is attempted to be presented is one that relates to the extent that, upon cross-examination of expert witnesses, such witnesses can be required to express opinions upon hypotheses broader or more or less extensive than the actual facts in proof. In this case, the difficulty is, that the facts are not stated in the exception as they were actually shown in proof, and, therefore, it can not be seen or determined whether the hypothetical questions put in cross-examination were within proper limits. We must assume, however, that the court was governed by the proper rules upon the subject. It was the duty of the party making the objection and taking the exception to have incorporated in the bill of exception the true state of facts upon which his exception was founded. There is, however, an entire absence of such facts, except as we have them stated in the hypotheses of the questions put to the witnesses. Assuming, however, that there was proof of the facts embraced in the hypotheses of the questions, we can perceive no error in the ruling of the court thereon.

But suppose the hypothesis of the question put on cross-examination was not strictly founded upon the facts in proof, but in some respects varied therefrom, it would not follow that there was error in allowing such question to be put to an expert witness. For the rule is well settled, that

experts may be cross-examined on purely abstract questions, assuming facts and theories that are not based on the special evidence of the particular case. As was said by the Supreme Court of the State of Kansas, in the case of *State* v. *Reddick*, 7 Kans. 143: "On cross-examination the counsel for the State put a hypothetical question intended to cover all the circumstances detailed by the witnesses on the trial, and asking from these facts whether the witness would consider a person so acting of unsound mind." "It is claimed," said the court, "that the hypothesis falls far short of including all the facts in testimony in the case; but in what particular has not been pointed out by counsel for the appellant. Nor have we been able to perceive, nor is it now material to determine, whether such is the fact, because, on cross-examination, great latitude is necessarily indulged; that the intelligence of the witness, his powers of discernment, and capacity to form a correct judgment, may be submitted to the consideration of the jury before whom he has testified, that they may have an opportunity of determining the value of his testimony; and for these reasons the question asked was not a departure from the rule regulating the cross-examination of expert witnesses."

And so, in the case of *People* v. *Augsbury*, 97 N. Y. 501, it was said by the court that, "On cross-examination, such abstract or theoretical questions not founded upon the facts of the case on trial, may be put for the purpose of testing the knowledge and information of the witness as to the subject upon which he has been examined, and his competency to give the opinion which he may have pronounced on his direct examination ; but the allowance of such questions, like other collateral inquiries touching only the credibility of the witness, rests in the discretion of the court." The same principle was asserted in the cases of *Dilleber* v. *Home Life Ins. Co.*, 87 N. Y. 79, and of *Bever* v. *Spangler*, 93 Iowa, 576. And in the recent case of *Horton* v. *United States*, 15 App. D. C. 310, the question was quite fully considered

by this court, and the principle was there laid down with substantially the same qualification as in the cases to which we have referred in this opinion.

We perceive no error in respect to the ruling of the court, in allowing the hypothetical question to be put to, and the answer to be made by, the expert witness, on cross-examination.

5. The next and last assignment of error is based upon the granting of a certain instruction to the jury, at the request of the attorney for the United States, and the refusal of certain prayers for instruction, offered on behalf of the accused.

At the close of the evidence on behalf of the defense, the prosecution gave evidence, by a number of witnesses, that they had been employed from two to nine years in the same bureau of the Pension Office as the defendant, and who had known him intimately, and that the class of work on which the defendant had been engaged required a high degree of intellectual attainment, and that during this period they had never noticed any acts or conduct on the part of the defendant which would indicate that he was not of sound mind; that this knowledge of defendant's conduct extended up to within fourteen or fifteen hours of the time of the murder charged. The Government also introduced evidence by a number of the friends and neighbors of the defendant, who had lived in his vicinity and had had more or less intimate acquaintance with him, that they had never seen anything in the acts or conduct of the defendant which would indicate that he was not of sound mind; also the evidence of medical experts, who had personally examined the defendant on occasions, and who testified both from such personal examination and in response to hypothetical questions that they regarded him as entirely sane.

Upon the whole evidence, the court granted certain specific instructions at the instance of the Government, and also certain specific instructions on behalf of the accused,

and gave a full and fair charge upon the whole of the evidence, reading in connection with the general charge the specific instructions granted at the instance of the respective parties. Of the prayers offered by the accused for instruction, two were rejected, and it is to the rejection of those two prayers, and the granting of the seventh special instruction on the part of the Government, that exception has, been taken by the accused.

To properly understand the full import and materiality or non-materiality of the prayers involved in this exception, in view of the case as presented by the instructions granted, it may be proper to refer to and recite the special instructions given at the instance of the accused.

By the first of the instructions granted at the instance of the accused the jury were instructed "that if upon review of all the evidence in the case they were not convinced beyond a reasonable doubt that the defendant was conscious of his act at the time of the commission thereof, and then and there in a state of mind capable of determining right or wrong, then they will return a verdict of not guilty by reason of insanity, unless they further find that such unconsciousness and inability to determine right and wrong resulted solely from voluntary intoxication."

By the second instruction, the jury were directed "that in determining the guilt or innocence of the defendant his sanity or insanity was an essential element; and if upon a review of all the evidence in the case they had a reasonable doubt about the sanity of the defendant at the time of the killing of the deceased, they should return a verdict of not guilty by reason of insanity."

By the next instruction, though in substance but a repetition of the one preceding, the jury were informed "that the question of the sanity or insanity of the defendant was a question of fact wholly within their province, to be determined upon all the evidence in the case, and, reaching a conclusion upon this question, the defendant was entitled to

any reasonable doubt that might remain in their minds upon consideration of all. the evidence in the case."

The next instruction given informed the jury "that if they believed from the evidence that the defendant killed the deceased during an epileptic seizure and while in a state of unconsciousness produced by the said disease, they should return a verdict of not guilty by reason of insanity, even though they might find further from the evidence that the defendant, when not under the influence of said disease, had the power of determining right from wrong; and in determining this question the defendant was entitled to the benefit of any reasonable doubt which might remain in their minds after a consideration of all the evidence in the case."

By the next instruction, given on request of the accused, the jury were directed "that in determining the sanity or insanity of the defendant at the time of the killing of the deceased they should take into consideration all the facts and circumstances of defendant's whole life that were in evidence before them, together with the facts and circumstances immediately surrounding the killing of the deceased, and if upon the whole evidence they had a reasonable doubt of the defendant's sanity at the time of the homicide, their verdict should be, not guilty by reason of insanity."

Then we have the two prayers for instruction which were rejected; and they are as follows:

1. "The jury are instructed that if upon consideration of all the evidence they believe that the defendant at the time of the killing *was insane,* and such insanity was induced by the operation of strong drink upon a mind rendered unsound by an injury to the brain or by disease, they should return a verdict of not guilty by reason of insanity."

2. "The jury are instructed that if the defendant at the time of the killing, *although not insane,* was in such a condition of mind by reason of drunkenness as to be incapable of forming a specific intent to kill, the grade of his crime would be reduced to manslaughter."

The phraseology of these prayers is not only indefinite but exceedingly misleading, and therefore objectionable. In the first place, the record supplies no evidence upon which to base what would appear to be the theory intended to be propounded by these prayers, and to have granted them would have been simply to open a field of speculative discussion before the jury. But the whole scope of the defense set up by the accused was most amply and fairly embraced and covered by the instructions actually granted at his instance. Those instructions embraced every element of his defense, and they were granted in terms most favorable to the accused. There was, therefore, no reasonable ground for an exception to the refusal to grant the two prayers rejected by the court, even if the terms employed in them had been free from objection. The jury were fully informed of what was essential to render the accused criminally responsible for the act charged against him, and what condition of mind would render him irresponsible for his act. By the instructions given, the jury were fully informed that before they could find the accused guilty of the crime charged, insanity or unsoundness of mind being set up as a defense, they were required to find that the accused had sufficient capacity to distinguish between right and wrong, *at the time of and with respect to the act which was the subject of inquiry, beyond a reasonable doubt.* This was the condition of mind that the jury must have found the accused to have possessed at the time of the commission of the act charged, to have enabled them to find the verdict they did. That inquiry and test of responsibility were fully and fairly presented by the instructions given to the jury. *Davis* v. *United States*, 160 U. S. 469, 478.

The seventh special instruction, given at the instance of the attorney for the Government, to the effect that if the jury should find from the evidence that *up to the time* of committing the crime the accused *was sane*, and *sane immediately afterwards*, then the jury were instructed that they

should find him *sane at the moment when the crime was committed,* was certainly properly granted.    The manifest object of this instruction was to exclude the theory sometimes and in some courts indulged, of a mere momentary irresistible impulse to commit crime—a theory that has never received the sanction of the courts of the United States in the administration of the criminal law.    *Taylor* v. *United States,* 7 App. D. C. 27; *Horton* v. *United States,* 15 App. D. C. 310.

Upon review of the whole case, we find no error that calls for a reversal of the judgment, and that judgment must therefore be affirmed; and it is so ordered.

*Judgment affirmed.*